Filed 12/29/23  Rodas v. Dept. of Transportation CA4/1
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| CRUZ VIDAL AREVALO RODAS, as Personal Representative, etc. et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> STATE OF CALIFORNIA, DEPARTMENT OF TRANSPORTATION, <br><br> Defendant, Appellant and Cross-respondent. | D078583/D078581 <br><br><br> (Super. Ct. No. CV267867) |

CONSOLIDATED APPEALS from an amended judgment and a postjudgment order of the Superior Court of Santa Clara County, James L. Stoelker, Judge.  (Retired Judge of the Santa Clara Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Cross-appeal dismissed; amended judgment and postjudgment order affirmed.

Jeanne Scherer, Chief Counsel, G. Michael Harrington, Deputy Chief Counsel, Lucille Y. Baca, Assistant Chief Counsel, David Sullivan, Derek S. Van Hoften and Layla Labagh for Defendant, Appellant and Cross-respondent.

Buty & Curliano, Jason J. Curliano and Ondrej Likar for Plaintiff, Respondent, Cross-appellant and Appellant.

Case No. D078583 is an appeal and a cross-appeal from an amended judgment following a jury trial. The State of California Department of Transportation (Caltrans) is the appellant and cross-respondent; Cruz Vidal Arevalo Rodas and Gladys H. Ascencio Carpio, as personal representatives of the Estate of Kevin Josue Rodas Carpio, are the respondents and cross-appellants. Case No. D078581 is an appeal from a postjudgment order. Cruz Vidal Arevalo Rodas and Gladys H. Ascencio Carpio, as personal representatives of the Estate of Kevin Josue Rodas Carpio, are the appellants, and Caltrans is the respondent. The two appellate cases have been consolidated for all purposes.

## I. INTRODUCTION

Early one morning in January 2014, 17-year-old Kevin Carpio (Plaintiff) walked to school in Sunnyvale on a sidewalk next to the Lawrence Expressway. As he crossed an onramp to southbound U.S. 101 in a marked crosswalk, a car driven by Patrick Aubin (the driver) struck Carpio. Carpio suffered catastrophic injuries and, sadly, passed away during the pendency of this appeal.[1]

---

[1] Prior to Carpio's death, the action was litigated by Cruz Vidal Arevalo Rodas, as Carpio's guardian ad litem. Following Carpio's death, the probate court appointed Carpio's parents as special administrators with specified powers. Based on this appointment and a formal motion, the appellate court substituted Cruz Vidal Arevalo Rodas & Gladys H. Ascencio Carpio, as personal representatives of the Estate of Kevin Josue Rodas Carpio, in place of plaintiff/respondent/cross-appellant Kevin Josue Rodas Carpio. We use "Plaintiff" to mean either Carpio prior to his death or the personal representatives of his estate, depending on the context.

2

Plaintiff sued Caltrans alleging the intersection of the Lawrence Expressway and the onramp to U.S. 101 constituted a dangerous condition of public property under Government Code section 835.[2]  Plaintiff alleged Caltrans was responsible for his injuries not only for the negligent design of the onramp, including the placement of the crosswalk and signage, but also for failure to warn of the dangerous condition of the onramp.  This included the failure to maintain the crosswalk markings and surrounding bushes so they did not hide pedestrians or warning signs, thereby creating a trap for both drivers and pedestrians using the roadway in a reasonably foreseeable way.

Caltrans's principal defense is that all the allegations are protected by design immunity provided by section 830.6, which is intended to insulate from review in tort litigation the discretionary planning and design decisions by responsible public officials.  (*Baldwin v. State* (1972) 6 Cal.3d 424, 434.)  Plaintiff contends that, regardless of dangerous condition(s) associated with the *design* of the interchange and surrounding area, the evidence supported a finding of liability based on *nondesign-related* dangerous conditions such as the failure to warn of a concealed dangerous condition of the crosswalk resulting from the failure to maintain the crosswalk and bushes in the surrounding area.  A jury found Caltrans 100 percent responsible for Plaintiff's injuries and awarded a substantial judgment.

In a prior opinion, we reversed the amended judgment and remanded for new trial.  We concluded the jury's answers to the special verdict form were hopelessly inconsistent because the jury's special verdict found Caltrans liable for Carpio's injuries based on a dangerous condition of the onramp, but

---

[2]     Unspecified statutory references are to the Government Code.

3

also found the onramp was subject to design immunity. We could not reconcile the verdict because we could not determine if the dangerous condition the jury found was associated with a design condition or a nondesign condition such as a failure to warn or maintain. We followed a line of cases holding that there is no exception to design immunity for a public entity's failure to warn of a hidden dangerous condition created by an approved design. The Supreme Court granted review, but deferred briefing pending the Supreme Court's consideration of a Second District decision holding a public entity may be liable for failure to warn of a known hidden dangerous condition even if that condition is subject to design immunity. (*Rodas v. California Dept. of Transportation* (Aug. 11, 2021, D078581, D078583), rev. granted Nov. 23, 2021, S270762.)

The Supreme Court affirmed the Second District's decision in *Tansavatdi v. City of Rancho Palos Verdes* (2023) 14 Cal.5th 639 (*Tansavatdi*).[3] The Supreme Court clarified, " 'design immunity for a dangerous condition [does] not necessarily shield the state from liability for a failure to warn of the same dangerous condition.' " (*Id*. at p. 657, quoting *Cameron v. State of California* (1972) 7 Cal.3d 318.) The court explained its holding in *Cameron* was not limited to situations where "a failure to warn claim challenges a road condition 'that was not part of the approved design.' " (*Tansavatdi*, at p. 659.) Thus, even if a plaintiff could demonstrate that the harmful condition was "*part of the approved plan* (thus precluding any claim

_____

3      The Second District decision was *Tansavatdi v. City of Rancho Palos Verdes* (2021) 60 Cal.App.5th 423, affd. (2023) 14 Cal.5th 639, 659.

The Supreme Court disapproved of the cases upon which we relied: *Weinstein v. Dept. of Transportation* (2006) 139 Cal.App.4th 52, disapproved by *Tansavatdi, supra*, 14 Cal.5th at p. 659; *Compton v. City of Santee* (1993) 12 Cal.App.4th 591, disapproved by *Tansavatdi*, at p. 659, fn. 4.

4

for having created the dangerous condition), plaintiffs would nonetheless remain entitled to move forward with their failure to warn claim." (*Ibid.*)

The Supreme Court transferred this matter back for our further consideration in light of its holding in *Tansavatdi, supra.* As directed by the Supreme Court, we vacated our prior decision and considered supplemental briefing from the parties and further oral argument.

With the benefit of the Supreme Court's clarification in *Tansavatdi, supra,* 14 Cal.5th 639, we conclude the jury's verdict is not hopelessly inconsistent. There is substantial evidence to support the jury's verdict finding that Caltrans was liable for failure to warn of a dangerous condition even if the dangerous condition was created by an approved design. Specifically, there is evidence to support the jury's finding that Caltrans failed to reasonably warn of a dangerous condition despite having notice of the condition for sufficient time to prevent harm. We, therefore, affirm the amended judgment.[4]

We also affirm a postjudgment order in which the trial court denied Plaintiff's motion to compel Caltrans to "immediately" pay the initial 50 percent installment of the periodic payment schedule under section 985. The trial court properly determined the enforcement proceedings are stayed pending this appeal pursuant to Code of Civil Procedure sections 916 and 995.220. And even if they were not automatically stayed, the trial court properly exercised its discretion under section 985 to stay the proceedings pending this appeal.

---

[4] As we explain in section III.A., *post*, we dismiss the cross-appeal of the amended judgment because Plaintiff is not aggrieved by the amended judgment.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Accident*

At the intersection of the Lawrence Expressway and U.S. 101 in Sunnyvale, there is an onramp to southbound U.S. 101 from the northbound Lawrence Expressway.  The construction of the Lawrence Expressway—U.S. 101 interchange (Project) was completed in approximately 2000.[5]

Both highways have four lanes going in each direction, and the onramp has three lanes, each of which can be accessed from a fifth "exit only" lane on the far righthand side of the northbound Lawrence Expressway.  More than 20 feet into the onramp to U.S. 101 off the Lawrence Expressway is a marked pedestrian crosswalk which connects the sidewalk along the east side of the expressway on both sides of the onramp.[6]

The accident occurred in the crosswalk shortly before 7:00 a.m. on a dark wet morning in January 2014.  Plaintiff was walking to school on the sidewalk adjacent to the northbound Lawrence Expressway.  As he crossed the onramp to U.S. 101 in the marked crosswalk, he was struck by a car and seriously injured.

---

[5]    At the interchange of the Lawrence Expressway and U.S. 101, the Lawrence Expressway runs north-south.  U.S. 101 generally runs north-south, but at this intersection, it runs northwest-southeast, such that the onramp at issue allows a driver to travel from the northbound Lawrence Expressway to southbound U.S. 101.

[6]    Consistent with Plaintiff's complaint in this action, we understand the public property at issue in this case to be "the sidewalk adjacent to [the] intersection of [the] northbound Lawrence Expressway and the freeway onramp to southbound Interstate Route [*sic*] 101 . . . and [the] surrounding area."

6

The driver of the car that hit Plaintiff was a 24-year-old man who had just finished his work as a security guard. His shift began at 10:00 p.m. the evening before the accident and ended at 6:45 a.m. the morning of the accident. Minutes after leaving work, as the driver proceeded north on the Lawrence Expressway near the U.S. 101 interchange, due to darkness, rain, and fog, the driver had turned on both the headlights and windshield wipers of his car.

The driver was familiar with the route. On that stretch of the Lawrence Expressway, the speed limit was 50 miles per hour, and he was traveling at a rate of approximately 45 miles per hour. As he approached the onramp to southbound U.S. 101, the driver signaled, moved over to the far right exit lane, and decreased the vehicle's speed to approximately 35 miles per hour. From his familiarity with the route and the signage, the driver was aware of pedestrians on the sidewalk and the crosswalk on the onramp, although he previously had never seen a pedestrian in the crosswalk or in the general vicinity of the crosswalk.

As the driver prepared to enter the onramp to U.S. 101, he was paying "full attention" to driving as safely as he could and did not see anything in the roadway. In the "split second" before the impact of striking Carpio—who was walking in the crosswalk—the driver realized that something was in front of him. Only after Carpio hit the driver's windshield and the driver pulled over and got out of his car to see what had happened did the driver realize that his car had struck Carpio. Carpio suffered catastrophic injuries, leaving him in what an expert at trial described as "a persistent or permanent vegetative state" following "a very severe . . . traumatic brain injury."

7

B.    *The Pleadings*

Plaintiff filed the underlying action against Caltrans, the City of Sunnyvale, the County of Santa Clara, the driver, and the owner of the vehicle that struck him.  In the first cause of action, Plaintiff alleged negligence against the driver and the owner of the vehicle.  In the second cause of action, Plaintiff alleged a dangerous condition of public property against Caltrans, the city, and the county.

All that is before us in this appeal is Plaintiff's second cause of action against Caltrans.  The allegations against Caltrans included:

- Caltrans "owned, operated, designed, constructed, maintained, inspected, repaired, cleaned, and controlled the intersection, pedestrian crosswalk and surrounding area at the [property] at the time of, and before the [accident]";
- Caltrans "w[as] negligent and careless in the design, construction, maintenance, inspection, repair, and control of the [property]";
- Caltrans's acts or omissions resulted in the following dangerous conditions, which "separately and in combination" caused the accident:
    o  "Failure to warn of, prevent, and/or correct the dangerous condition";
    o  "Dangerous placement of the pedestrian crosswalk";
    o  "Dangerous and confusing placement of signs before the pedestrian crosswalk";
    o  "Dangerous and confusing placement of roadway markings";
    o  "Creating a confusing roadway in terms of signage, roadway markings, and traffic lights near the pedestrian crosswalk";
    o  "Failure to place proper warnings, signs, traffic control devices, and/or other indications of the pedestrian crosswalk";

8

- o "Failure to provide and/or maintain adequate signs or warnings";

- o "Failure to provide stop signs or traffic lights at the intersection of northbound Lawrence Expressway and the onramp to southbound Interstate 101";

- o "Dangerous placement of the pedestrian crosswalk beyond the crest of an incline";

- o "Dangerous placement of trees and bushes";

- o "Failure to properly maintain the surrounding bushes and trees such that they did not obscure and hide pedestrians, the pedestrian crosswalk, warning signs, and/or signs indicating the presence of the pedestrian crosswalk";

- o "Failure to warn or redirect pedestrians away from crossing the onramp";

- o "Failure to maintain the paint on the pedestrian crosswalk"; and

- o "Failure to make the pedestrian crosswalk, signs indicating the pedestrian crosswalk to drivers, and pedestrians using the crosswalk . . . visible through adequate lighting."

- These dangerous conditions "created a trap for members of the public using the roadway in a reasonably foreseeable way," and Caltrans "failed to adequately warn users, including pedestrians and drivers, of the trap"; and

- Caltrans "should have prevented the dangerous condition" either "by having in place a reasonable inspection system that would have revealed the dangerous condition" or, if Caltrans had such a system, it "did not use reasonable care in maintaining and operating the system."

9

Caltrans denied the allegations and asserted affirmative defenses. Among these defenses, Caltrans alleged design immunity under section 830.6 and limited signage immunity under section 830.8.[7]

C.    *The Trial*

Before discussing the evidence, we provide some legal context for the issues at trial.  Thereafter, we describe the evidence relied upon by the parties in their appellate briefing.

1.    *Issues*

Pursuant to the Government Claims Act (§ 810 et seq.), public entities are liable only to the extent provided by statute.  (§ 815, subd. (a); *Quigley v. Garden Valley Fire Protection Dist*. (2019) 7 Cal.5th 798, 803.)  As we introduced *ante*, Plaintiff alleged liability for a dangerous condition of public property under section 835, and Caltrans's principal defense was design immunity under section 830.6.

---

[7]    Caltrans's sixth affirmative defense provides in full:  "The alleged condition of property was created by construction in accordance with a plan or design of construction or of improvement to public property, and said plan or design was approved in advance of construction or improvement by an officer or employee of a public entity vested with discretionary authority to approve said plan or design or was prepared in conformity with standards previously so approved, and said approvals were reasonable; therefore [Caltrans] is not liable to Plaintiff pursuant to Government Code[,] § 830.6."

Caltrans's eighth affirmative defense provides in full:  "The condition of property was allegedly the result of a failure to provide regulatory and/or warning signals, signs, markings, or other devices, and therefore [Caltrans] is not liable to Plaintiff pursuant to Government Code[,] §§ 830.4 and 830.8."

a. *Dangerous Condition of Public Property (§ 835)*

Section 835 provides the basis for liability in an action against a public entity for an injury caused by the dangerous condition of public property.[8] To establish liability under section 835, a claimant must prove the following elements: (1) The public property was "in a dangerous condition at the time of the injury"; (2) the injury was "proximately caused by the dangerous condition"; (3) the kind of injury that occurred was "reasonably foreseeable" as a consequence of the dangerous condition; and (4) either (a) a public employee, within the scope of employment, created the dangerous condition by a "negligent or wrongful act or omission" or (b) the public entity had "actual or constructive notice of the dangerous condition" a sufficient time before the injury to have taken reasonable measures to protect against the injury.

b. *Design Immunity (§ 830.6)*

In addition to all affirmative defenses available to private party defendants in similar situations (§ 815, subd. (b)), a public entity has available to it certain statutory defenses and statutory immunities (see Van Alstyne, et al., Cal. Government Tort Liability Practice (4th ed. Cont.Ed.Bar 2021) §§ 12.61-12.101, pp. 12-88 – 12-144). The statutory design immunity provided by section 830.6 is principally at issue here.

To establish design immunity—by which a public entity is generally not liable for injuries caused by a dangerous condition of public property—the

---

8    The Government Claims Act defines " '[d]angerous condition' " as "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." (§ 830, subd. (a).)

defendant must prove the following three elements: (1) "a causal relationship between the plan or design and the accident"; (2) "discretionary approval of the plan or design prior to construction"; and (3) "substantial evidence supporting the reasonableness of the plan or design." (*Cornette v. Dept. of Transportation* (2001) 26 Cal.4th 63, 66 (*Cornette*); see § 830.6.) The third element—i.e., reasonableness of the approval process—is an issue decided by the court, not the trier of fact. (*Cornette*, at p. 66; *Menges v. Dept. of Transportation* (2020) 59 Cal.App.5th 13, 21.)

Section 830.6's immunity may be lost if the party opposing the application of the defense can establish that "changed physical conditions" of the plan or design produced the dangerous condition at issue. (*Alvarez v. State of California* (1999) 79 Cal.App.4th 720, 737 (*Alvarez*), abrogated on another point in *Cornette, supra,* 26 Cal.4th at pp. 67, 74 & fn. 3, italics added.) The party opposing the application of the defense has the burden of establishing the loss of the immunity. (*Cornette*, at p. 72.)

2. *Plaintiff's Case*

Plaintiff presented evidence at trial in support of four dangerous conditions he contended were not related to design.

*First*, he contended "[t]he unkempt and overgrown shrubbery and bushes" created a dangerous condition. (Bolding omitted.) Next to the roadway where the driver struck Plaintiff (i.e., to the right of the sidewalk along the east side of the Lawrence Expressway and the onramp to U.S. 101), there are trees, bushes, and groundcover.

In places, this vegetation partially covered or cast shadows on street signs (including signs warning drivers of pedestrians and the crosswalk across the onramp to U.S. 101) and blocked a clear view of the onramp from the right-turn lane.

12

According to the Caltrans supervisor responsible for landscaping maintenance at and around the Project, there was no schedule for maintenance. Rather, work was often prompted by a complaint from a member of the public. Looking at photographs of the area, the supervisor agreed overgrowth pushing into the sidewalk needed to be trimmed.

*Second*, Plaintiff contended "[t]he faded crosswalk lines" were a dangerous condition. The jury was shown photographs of the crosswalk taken approximately three weeks after the accident showing faded crosswalk lines and areas where the lines were worn away.

Caltrans's maintenance area superintendent, charged with the responsibility of overseeing the four supervisors who manage all nine Bay Area counties (each of whom supervises six or seven employees) testified as to the condition of the crosswalk at issue.[9] Prior to the January 2014 accident, the crosswalk lines had not been repainted during the 14 years since they were installed. The superintendent agreed it is important that drivers can see road markings like the crosswalk. He explained the painted lines provide "retroreflectivity," which is what occurs when a driver's headlights "touch the pavement markings, the striping[,] and the pavement markers[;] and they reflect the light back toward the occupants in the vehicle."[10] He agreed "a primary part" of the job of a Caltrans maintenance crew is to refresh roadway markings like the crosswalk at issue here. Caltrans maintenance crews conduct yearly nighttime inspections of such roadway markings.

---

9    Caltrans had designated the superintendent as the person most knowledgeable on the issue of roadway maintenance.

10    "Retro reflectivity" is a term that appears in the Caltrans maintenance manual.

The supervisor of the six-person maintenance crew for the area near the onramp acknowledged that he never told his crew members that they should report any road markings or other conditions that they believed to present a danger to pedestrians or drivers. According to the supervisor, reporting dangers is not part of a crew member's job; a crew member is to do the actual maintenance, as directed by a supervisor.

Testimony from this supervisor's crew members established that they did not receive training from Caltrans on how to conduct inspections, such as how to measure sight distances or retroreflectivity. Crew members were told to use their own best judgment when conducting inspections. One crew member testified that he had never used the concept of retroreflectivity when, during the night inspections, he determined whether roadway markings needed to be refreshed.

Plaintiff also presented expert opinion testimony regarding the need for Caltrans to have a formal training program for its maintenance employees. This training should include the standards to be used when evaluating roadway markings.

*Third*, Plaintiff contended "[t]he painting of the crosswalk lines in relation to the crest in the roadway" was a dangerous condition because the vertical crest obscured the crosswalk from the view of motorists. As background, the California Highway Patrol officer who investigated the scene of the accident testified that "a small crest" on the onramp "hid the lines on the crosswalk" where the accident occurred. A civil engineer testified that the placement of the crosswalk in relation to the crest of the road was not a design feature of the Project.

A senior Caltrans civil engineer, whom Caltrans designated as the person most knowledgeable, stated that the calculations on the as-built

14

drawings showed the crosswalk at the top, or upslope, of the vertical curve. He believed a driver approaching the crosswalk could see it because of its placement. However, the engineer never went to the scene to see where the crosswalk was actually placed. Caltrans's roadway engineering expert agreed the crosswalk lines were placed behind the crest of the onramp.

A Caltrans project engineer testified in deposition that, based on his memory from 20 years earlier, he did not recall who decided to put a crosswalk on the onramp and what process, if any, was involved in deciding whether to place a signal device on the onramp by the crosswalk.

Plaintiff presented evidence from Caltrans documents and from human factors and engineering experts that crosswalks create a "false sense of security" for pedestrians who think the crosswalk provides them with protection. Pedestrians, who have a crosswalk in front of them, think drivers will also see the crosswalk and realize they need to slow down and stop.

*Fourth*, Plaintiff contended "[the lack of] adequate roadway markings and signage" was a dangerous condition. Plaintiff's expert on "human factors engineering or ergonomics or engineering psychology" first opined that, because the driver here "had been through the location so many times and had not encountered a pedestrian," the driver had lost any expectancy that he would encounter a pedestrian. The expert explained that traffic signs and roadway markings increase a driver's expectancy and that the following conditions contributed to the driver's lack of expectancy in this case: The warning sign closest to the crosswalk was "obscured by shrubs and plants"; the lines on the crosswalk were "badly faded"; and the advance sign gives no information about where the crosswalk is located or when a driver might

15

encounter a pedestrian.[11]  The expert also provided his opinions as to what changes could be made to increase a driver's expectancy of a crosswalk on the onramp to U.S. 101 such as making the markings of the crossing more visible for a greater distance, additional pavement markings, and signs with arrows about the crossing at appropriate distances so they can be seen in sufficient time to make decisions to stop when necessary.

Consistent with this evidence of four specific conditions, the bulk of Plaintiff's counsel's closing argument focused on what Plaintiff contended were dangerous conditions that resulted from Caltrans's failure to maintain the property and, as a result, Caltrans's failure to warn of the dangerous condition.  Counsel also argued that, because the plans and designs for the Project did not include faded crosswalks or overgrown shrubbery, dangerous conditions resulting from failures to maintain or to warn are not subject to the defense of design immunity.  Counsel argued there was a concealed trap due to both the location of the crosswalk behind the crest and the faded crosswalk lines.  The pedestrian had a false sense of security because he was using the crosswalk, but the driver lacked visual cues about the crosswalk due to the location and condition of the crosswalk markings.

When discussing with the jury question No. 6 of the special verdict form ("Was the dangerous condition . . . in the plan or design for the roadway?"), counsel said:  "I think that's an easy 'No,' because a failure to maintain is not in the plan or design."

---

[11]    The expert further testified that the two pedestrian crossing signs along the Lawrence Expressway just before the ramp to U.S. 101 were "obsolete," and should have been replaced in 2011 according to a Caltrans manual.  He did not directly tie that fact into his opinions regarding the driver's expectancy.

16

In addition, he contended at trial there were other dangerous conditions for purposes of Caltrans's liability. For example, on direct examination, Plaintiff's human factors expert opined that the location of the crosswalk on the onramp to U.S. 101—i.e., "mid-block"—was a dangerous condition by itself.

3. *Caltrans's Case*

Caltrans focused on evidence of a specific dangerous condition (namely, that the location of the crosswalk was included in the plan or design) and then explained the discretionary approval process that preceded the construction of the Project that included this condition.

In trial proceedings prior to empaneling the jury, the court received evidence and ruled that, for purposes of Caltrans's design immunity defense (§ 830.6), Caltrans presented substantial evidence to establish reasonable public employees could have approved the plan or design for the 1996 Project. (See *Cornette*, *supra*, 26 Cal.4th at p. 66 [court determines as a matter of law whether substantial evidence supports reasonableness of plan or design].) The court properly left for the jury, as the factfinder: (1) the remaining two elements for an application of the design immunity defense (see *ibid*.); as well as (2) the elements at issue for Plaintiff's claims of sufficiently changed physical conditions to establish the loss of this defense (see *Alvarez*, *supra*, 79 Cal.App.4th at p. 737; *Cornette*, at p. 72).

Regarding the remaining elements of the design immunity defense, Caltrans presented evidence from the Project engineer that the onramp was constructed as part of the Project that began in 1994 and was completed in 2000. In response to Plaintiff's human factors expert who testified that the *location of the crosswalk* on the onramp to U.S. 101 (i.e. mid-block) was a dangerous condition, the Project engineer testified that the *location of the*

17

*crosswalk* was determined by information contained in the Project plans—namely, "the geometry of the interchange, location of the lanes, the location of the sidewalks, [and] the placement of the wheelchair ramps."[12]  After identifying his signature on the top of the plans, this witness identified where the plans contained "the location of the crosswalk that's at issue in this case." He also explained that the Project plans—in particular, a "profile sheet" Caltrans created for the contractor—directed the location of the vertical curve, which included the crest, on the onramp.[13]

Caltrans also presented testimony from its civil engineering and traffic expert, who interpreted one specifically identified page of the Project plans that "accounted for the vertical curve"—which included "the crest."

Finally, Caltrans presented evidence that the resident engineer for the Project is "the field engineer responsible for the administration of the contract and making sure that the project is built according to the plans specifications, calculations and the standards."  The Project engineer testified that his signature on the as-built plans indicated that:  "headquarters approved the set of plans and they were transferred to construction to be built"; the plans were "prepared according to standards and . . . prepared under [his] supervision"; and "the [Project] was built according to the plans and according to the . . . California standards from that time."

---

[12]  The project engineer identified trial exhibit No. 507 as the 245-page "as-built" "project plans."

[13]  According to the Project engineer, the "crest of the [on]ramp" is the "inflection point" on the "vertical curve"; and a vertical curve is required because the Lawrence Expressway goes over U.S. 101, and the onramp to U.S. 101 must account for this difference in elevation.

Caltrans identified the Project plans which included the crosswalk, the vertical curve alignment, Americans With Disabilities Act ramps, pedestrian warning signs, a lighting plan, and a landscape plan.

A Caltrans traffic engineer testified that over 120,000 pedestrians used the crosswalk over a 12-year period since the Project was completed and approximately 46 million cars used the ramp in that time. He extrapolated this information from a traffic study conducted after the accident.

### 4. *The Special Verdict and the Judgment*

The court and counsel discussed the special verdict form before closing arguments. Counsel met and conferred about the form, but still presented separate forms to the court with some differences. Among the differences between the forms, Plaintiff's counsel informed the court that they initially proposed a special verdict form that listed out in question one specific dangerous conditions such as "the crosswalk, the landscaping, the signs . . . ." After discussions with Caltrans, Plaintiff's counsel modified question one to say, "the on-ramp and surrounding area, which brings into play the landscaping and the signs." Caltrans, however, proposed using only "the on[-]ramp." Plaintiff's counsel thought this was misleading. Caltrans responded saying, "the issue is the on-ramp itself. The surrounding areas is—that include all the way back to—all the way to the on-ramp. The issue is we focus right around that on-ramp. That's the issue to us."

The court considered the verdict form during a break in the proceedings. The court elected to use Plaintiff's verdict form with modifications. Question one in the final verdict form asked only about whether "the onramp" was "in a dangerous condition at the time of the accident."

19

When Plaintiff's counsel discussed in closing statements question No. 1 of the special verdict ("Was the onramp from northbound Lawrence Expressway to southbound [U.S.] 101 in a dangerous condition at the time of the accident?", Plaintiff's counsel explained to the jury: "This on-ramp includes the on-ramp, crosswalk, the shrubbery, the lack of signs . . . [, and the] lack of shark teeth."

In Caltrans's closing argument, counsel told the jury:

"On the . . . the issue of design immunity, basically, there's two elements that are involved in play here. One deals with: . . . w[ere] the features that Plaintiff is complaining about that caused this accident[—]that is, the foliage, the crosswalk in relation to the crest, and the signage—were those present on the plans? [¶] And I would say yes they were.

". . . [T]he next one will be[:] . . . was the dangerous condition that was a substantial factor in cau[sing] harm to Plaintiff in the plan or design for the roadway? . . . [¶] So was the crosswalk located included in the plans? Yes. [¶] Exhibit 507-100.

"Was the foliage included on plans? Yes. [¶] Exhibit 507-162.

"Was the vertical curve shown on the plans? Yes. [¶] Exhibit 507[-0]16? [¶] . . . [¶]

"The sign plan—that's Exhibit 640—shows the general location of . . . the signs.

"The lighting plan, with the overhead lights, that's 507-177.

"So all of these features were present in the plans."

The jury answered 16 questions on special verdict as follows:

"1. Was the onramp from northbound Lawrence Expressway to southbound US 101 in a dangerous condition at the time of the accident?

" <u>  X  </u>     Yes          _____ No

"*If your answer to Question 1 is yes, then answer Question 2. If you answered no, enter a zero next to the*

20

*State of California/Caltrans' name in Question 16 and then move to Question 11.*

"2. Did the dangerous condition create a reasonably foreseeable risk of the kind of injury that occurred?

"  X       Yes              _____ No

*"If your answer to Question 2 is yes, then answer Question 3. If you answered no, enter a zero next to the State of California/Caltrans' name in Question 16 and then move to Question 11.*

"3. Did the negligent or wrongful conduct of the State of California/Caltrans' employee(s) acting in the scope of his/her/their employment create the dangerous condition?

"  X       Yes              _____ No

"or

"Did the State of California/Caltrans have actual or constructive notice of the dangerous condition for a long enough time to have protected against it?

"  X       Yes              _____ No

*"If your answer to either option in Question 3 is yes, then answer Question 4. If you answered no to both options, enter a zero next to the State of California/Caltrans*

*name in Question 16 and then move to Question 11.*

"4. Was the act or omission that created the dangerous condition reasonable?

"___   Yes              _____ No

"or

"Was the State of California/Caltrans acting reasonably in failing to take sufficient steps to protect against the risk of injury?

"_____ Yes              X   No

*"If your answer to either option in Question 4 is no, then answer Question 5. If you answered yes to both options, enter a zero next to the State of California/Caltrans' name in Question 16 and then move to Question 11.*

21

"5. Was the dangerous condition a substantial factor in causing harm to Kevin Carpio?

"  X      Yes                    _____ No

*"If your answer to Question 5 is yes, then answer Question 6. If you answered no, enter a zero next to the State of California/Caltrans' name in Question 16 and then move to Question 11.*

"6. Was the dangerous condition that was a substantial factor in causing harm to plaintiff in the plan or design for the roadway?

"  X      Yes                    _____ No

*"If your answer to Question 6 is yes, then answer Question 7. If you answered no, move to Question 11.*

"7. Was the dangerous condition in the plan or design for the roadway approved by a person exercising discretionary authority to approve the plan or design?

"  X      Yes                    _____ No

*"If your answer to Question 7 is yes, then answer Question 8. If you answered no, move to Question 11.*

"8. Did the State of California/Caltrans fail to provide adequate warnings of the dangerous condition?

"  X      Yes                    _____ No

"If so, did the failure to warn contribute to causing harm to Kevin Carpio?

"  X      Yes                    _____ No

*"If your answer to both options in Questions 8 is yes, move on to Question 11. If you answered no to either option in Question 8, then move on to Question 9.*

"9. Did the subject roadway become dangerous because of a change in physical conditions?

"_____ Yes               _____ No

*"If your answer to Question 9 is yes, then answer Question 10. If you answered no, enter a zero next to the State of California/Caltrans' name in Question 16 and then move to Question 11.*

22

"10. Did the State of California/Caltrans have actual or constructive notice of the dangerous condition created because of the change in physical conditions?

"_____ Yes               _____ No

"*If your answer to Question 10 is yes, then answer Question 11. If you answered no, enter a zero next to the State of California/Caltrans' name in Question 16 and then move to Question 11.*

"11. Was [the driver of the vehicle that struck Plaintiff] negligent?

"_____ Yes               _X_ No

"*If your answer to Question 11 is yes, then answer Question 12. If you answered no, enter a zero next to [the driver's] name in Question 16 and then move to Question 13.*

"12. Was [the driver's] negligence a substantial factor in causing harm to Kevin Carpio?

"_____ Yes               _____ No

"*If your answer to Question 12 is yes, answer Question 13. If you answered no, enter a zero next to [the driver's] name in Question 16 and then move to Question 13.*

"13. Was plaintiff Kevin Carpio negligent?

"_____ Yes               _X_ No

"*If your answer to Question 13 is yes, then answer Question 14. If you answered no, enter a zero next to Kevin Carpio's name in Question 16, and then move to Question 15.*

"14. Was plaintiff Kevin Carpio's negligence a substantial factor in causing his harm?

"_____ Yes               _____ No

"*If your answer to Question 14 is yes, then answer Question 15. If you answered no, enter a zero next to Kevin Carpio's name in Question 16, and then move to Question 15.*

23

"15.  What are Kevin Carpio's damages?  Do not reduce the damages based on the fault, if any, of the State of California/Caltrans, [the driver], or Kevin Carpio.

"a.  Past economic loss

"i.  Past lost earnings             $       5,686

"ii. Past medical expenses     $2,097,679

"Total Past Economic Damages:     $2,103,365

"b.  Future economic loss

"i.  Future lost earnings        $1,599,377

"ii.  Future medical expenses  $6,036,105

"iii. Other future economic loss
                                   $   450,000

"Total Future Economic Damages:  $8,085,482

"c.  Past noneconomic loss, including loss of enjoyment of life and pain and suffering

                                   $ 2,000,000

"d.  Future noneconomic loss, including loss of enjoyment of life and pain and suffering

                                   $12,000,000

"Total Damages:  $24,188,847

    "*Answer Question 16.*

"16.  What percentage of responsibility for Kevin Carpio's harm do you assign to the following?  Insert a percentage for only those who received 'yes' answers in Question Nos. 5, 12, and/or 14.  Do not enter a percentage next to a party if you were already instructed to enter a zero next to that party's name:

"The State of California/Caltrans     100%

"[The driver]                           0%

"Kevin Carpio                           0%"

Based on the foregoing special verdict, the court entered a judgment and, days later, an amended judgment. All that is at issue in this appeal is the amended judgment (Judgment)—in favor of Plaintiff and against Caltrans in the amount of $24,188,847 and in favor of the driver and against Caltrans.[14]

5.    *Postjudgment Proceedings*

Caltrans moved to vacate the Judgment pursuant to Code of Civil Procedure section 663. Caltrans relied on the answers to the special verdict (in particular, the answers to question Nos. 1, 5, 6, and 7), by which the jury found that the dangerous condition in the case was a substantial factor in causing harm to Plaintiff and was included in the plan or design of the Project. Caltrans argued that, based on these findings, the court was required to apply the statutory design immunity provided in section 830.6; and an application of that complete defense required the court to enter judgment in favor of Caltrans. The court denied the motion (Section 663 Order). As we explain at footnote 18, *post*, because there is no appeal from this order, it is not before us for appellate review. Nonetheless, the Section 663 Order was properly designated and included in the record on appeal; and it explains the trial court's reasoning.

The court agreed, based on its legal ruling as to the reasonableness of the approval process of the plans and design of the Project and the jury's

---

14    Caltrans tells us that the City of Sunnyvale and the County of Santa Clara settled with Plaintiff. The owner and driver of the vehicle settled on the eve of and during trial. Neither the city, the county, nor the car owner is mentioned in the Judgment. There is no issue on appeal related to any of these parties.

answers to the special verdict questions (in particular, Nos. 6 & 7[15]), a finding of section 830.6 design immunity was "compelled."[16] The court observed that the jurors were not asked to determine if design immunity had been lost because the verdict form directed the jurors to skip those questions (Nos. 9 and 10) if it found Caltrans failed to provide adequate warnings of dangerous conditions and that failure contributed to Plaintiff's harm (No. 8). The court commented, "This suggests that both sides had concluded for purposes of the verdict form that if the jury found that failure to warn was a cause of injury, the questions related to loss of design immunity became irrelevant."

The court acknowledged the "verdict form is not a masterpiece of clarity," and said, "there was no good reason [for the verdict form] to direct the jurors to skip over questions 9 and 10, the answers to which very well might have found loss of design immunity"—a finding that would have been "justif[ied]" based on the evidence presented.[17]

---

[15] By its answers to question Nos. 6 and 7, the jury necessarily found that a dangerous condition that was a substantial factor in causing harm to Plaintiff was "in the plan or design for the roadway."

[16] According to the court: "Indeed, even [P]laintiff does not dispute the finding of design immunity."

[17] The jury followed the instructions on the special verdict, which required the jury to skip question Nos. 9 and 10. Had the jury answered those questions in the affirmative, arguably the findings would have supported Plaintiff's claim that, because of a change in the physical conditions that were approved in the plan or design, Caltrans's section 830.6 design immunity defense would have been lost. (See *Alvarez, supra,* 79 Cal.App.4th at p. 737.)

26

Nevertheless, the court ruled that, because the special verdict did not "direct the jurors to find a design defect or not[] . . . , there cannot be a compelled conclusion that a jury finding on the issue of design defect clearly excludes or subsumes all other possible theories of negligence." "On the contrary," the court determined, "the logical reading of the verdict form allows the jury to find on several separate and independent bases of liability, including active and passive negligence." The court found it notable that the jury "found virtually every potential form of liability against [Caltrans] and then confirmed that liability with a substantial damages award."

The court rejected Caltrans's contention that the evidence required a conclusion that all theories of recovery, including failure to warn, were related to design. The court stated, "this argument ignores substantial evidence, both expert and otherwise, related to the maintenance of the retroreflective painted crosswalk and landscaping. Failure to maintain is within the scope of and consistent with the special findings of the jury." It concluded, "[n]ot every failure to warn is the result of a design defect" and "[n]ot every failure to maintain is linked to design defect." Therefore, the court found no basis to vacate the judgment.

The court granted Caltrans's motion to authorize periodic payments of the Judgment under Code of Civil Procedure section 984.

D.    *The Appeals*

Caltrans appealed the Judgment.[18] That commenced what is now case No. D078583. Plaintiff timely cross-appealed, and the cross-appeal is also part of what is now case No. D078583.

---

[18]    In its opening brief in D078583, Caltrans tells us that it also appealed from the Section 663 Order. However, (1) Caltrans provides no record reference for its statement; (2) the clerk's transcript contains no such notice of appeal; and (3) because Caltrans's notice of appeal is expressly limited to

27

Based on the order authorizing periodic payments, Plaintiff filed a motion under Code of Civil Procedure section 984 to enforce the terms of the payment schedule and to compel Caltrans to pay 50 percent of the Judgment. The trial court denied Plaintiff's motion (Postjudgment Order) due to the pending appeal. Plaintiff appealed the Postjudgment Order. That commenced the appeal with docket No. D078581.

We consolidated case Nos. D078583 and D078581.

### III.  DISCUSSION

As we will explain, this court lacks jurisdiction to consider Plaintiff's cross-appeal from the Judgment; and, thus, we will dismiss it. We affirm the Judgment and the Postjudgment Order.

A.    *Plaintiff's Cross-Appeal from the Judgment (D078583)*

The rule of appellate standing is codified in Code of Civil Procedure section 902, which provides in part: "Any party *aggrieved* may appeal . . . ." (Italics added.) "One is considered 'aggrieved' whose rights or interests are injuriously affected by the judgment." (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737 (*County of Alameda*).) The "interest ' "must be immediate, pecuniary, and substantial and not nominal or a remote consequence of the judgment." ' " (*Ibid.*)

"A party is not aggrieved by a judgment or order rendered in its favor" (*Gober v. Ralphs Grocery Co.* (2006) 137 Cal.App.4th 204, 211); and here

the judgment and the amended judgment, this appeal is necessarily so limited (*Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 46 [Cal. Rules of Court, rule 8.100(a)(2)'s rule of liberal construction is inapplicable where, as here, "the notice of appeal unambiguously designates" a specific document]). Thus, this court lacks jurisdiction to review the Section 663 Order. (*K.J. v. Los Angeles Unified School Dist.* (2020) 8 Cal.5th 875, 881 [timely notice of appeal " 'is an absolute prerequisite to the exercise of appellate jurisdiction' "].)

28

there is a $24 million judgment in Plaintiff's favor. Thus, for purposes of Code of Civil Procedure section 902, because Plaintiff is not aggrieved by the Judgment, Plaintiff lacks standing to appeal from the Judgment.

In the notice of appeal, Plaintiff states: "The portion of this Judgment being appealed is the finding of the elements of design immunity, including, without limitation, the portion of the judgment if any, based on the jury's findings in questions 6 and 7 of the Special Verdict." Although the Judgment includes a copy of the special verdict, the Judgment itself does not contain any such "findings"; it directs a judgment in favor of the driver (and against Plaintiff) and a judgment in favor of Plaintiff (and against Caltrans) in an amount more than $24 million.

In the introduction to the opening brief in his cross-appeal, Plaintiff describes his presentation as a "protective cross-appeal"—namely, *if* the appellate court is inclined to reverse the Judgment based on Caltrans's presentation regarding questions 6 and 7 of the special verdict (which deal with § 830.6 design immunity), *then* the court should consider whether the record contains substantial evidence to "support the jury's findings of any dangerous condition that was approved in a plan or design." However, "a protective cross-appeal protects a party's right to appeal from the original judgment when the judgment is attacked *by a posttrial motion*." (1 Cal. Civil Appellate Practice (Cont.Ed.Bar 3d ed. 2021), § 8.7, pp. 8–5, italics added.) Here, Caltrans's appeal does not include a challenge to a ruling from a posttrial motion. (See fn. 17, *ante*.) Instead, where (as here) the respondent wants to raise an argument in support of the judgment on appeal, a "cross-appeal is neither necessary or appropriate. The court of appeal will affirm if

29

the trial court judgment is correct on any theory.[19]  When the trial court's

result is correct but its reasoning wrong, *new arguments should be raised in*

*respondent's brief and not by cross-appeal.*"  (1 Cal. Civil Appellate Practice

(Cont.Ed.Bar 3d ed. 2021), § 8.4, pp. 8–4, italics added.)

Since Code of Civil Procedure section 902's standing requirement is

jurisdictional and since Plaintiff lacks standing to appeal from the Judgment,

we lack jurisdiction to consider Plaintiff's cross-appeal and must dismiss it.

(See *County of Alameda, supra,* 5 Cal.3d at p. 738.)

That said, as we just explained, the respondent may raise any

argument on appeal that establishes the judgment is correct on any theory.

Stated differently, pursuant to Code of Civil Procedure section 906, a

respondent may "assert[ ] an alternate legal theory upon which the judgment

may be affirmed, notwithstanding the court's resolution of the appellant's

contentions in the appellant's favor."  (*Preserve Poway v. City of Poway* (2016)

245 Cal.App.4th 560, 586.)

Here, in the cross-appeal, Plaintiff raises a substantial evidence

argument, and Caltrans fully responds to it.  Thus, Caltrans is not prejudiced

by our consideration of Plaintiff's substantial evidence argument.  For this

reason, we consider the substantive argument raised by Plaintiff in his cross-

appellant's opening brief as part of his respondent's brief in Caltrans's appeal

---

19     "No rule of decision is better or more firmly established by authority,
nor one resting upon a sounder basis of reason and propriety, than that a
ruling or decision, itself correct in law, will not be disturbed on appeal merely
because given for a wrong reason.  If right upon any theory of the law
applicable to the case, it must be sustained regardless of the considerations
which may have moved the trial court to its conclusion."  (*Davey v. Southern
Pacific Co.* (1897) 116 Cal. 325, 329.)

from the Judgment. Correspondingly, we consider the substantive argument raised by Caltrans in its cross-respondent's brief as part of its appellant's reply brief in its appeal from the Judgment.[20]

B. *Caltrans's Appeal from the Judgment (D078583)*

1. *Design Immunity Does Not Preclude Liability for Failure to Warn*

Caltrans does not contend that Plaintiff failed to prove liability against Caltrans (a public entity) caused by a dangerous condition of its property for purposes of section 835. It does not challenge that the jury's answers to special verdict question Nos. 1, 5, 2, and 3, respectively, established the following necessary elements for liability under section 835: The "onramp . . . was in a dangerous condition at the time of the injury"; the injury was "proximately caused by the dangerous condition"; the kind of injury that occurred was "reasonably foreseeable" as a consequence of the dangerous condition; and a public employee, within the scope of employment, created the dangerous condition by a "negligent or wrongful act or omission," *and* the public entity had "actual or constructive notice of the dangerous condition" a sufficient time before the injury to have taken reasonable measures to protect against the injury.[21]

---

[20] We do not consider the arguments raised by Plaintiff in his cross-appellant's reply brief, since that would be unfair to Caltrans. As the appellant, Caltrans has the burden of establishing reversible error on appeal (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609) and, therefore, the right to have the final word in seeking a reversal of the Judgment.

[21] In this latter regard, section 835 requires a finding *either* that an employee of the public entity created the dangerous condition by a negligent or wrongful act or omission *or* that the public entity had actual or constructive notice of the dangerous condition in sufficient time to have taken protective measures. Here, in response to special verdict question No. 3, the jury found *both*.

Instead, Caltrans challenges the trial court's failure to apply the statutory design immunity provided by section 830.6 as a complete defense to these findings of liability. According to Caltrans, the jury's answers to special verdict question Nos. 6 and 7, respectively, established the following elements necessary for the application of section 830.6 design immunity to the dangerous condition found by the jury in question No. 1: "a causal relationship between the plan or design and the accident"; and "discretionary approval of the plan or design prior to construction."[22] (*Cornette, supra,* 26 Cal.4th at p. 66.) Since the jury made no additional findings that design immunity had been lost, Caltrans argues we should reverse the Judgment and a remand with directions to enter a judgment in favor of Caltrans. We disagree.

The Supreme Court recently considered "whether design immunity bars all forms of claims that seek to impose liability for injuries resulting from a dangerous feature of a roadway" and, more specifically, "whether design immunity is limited to claims alleging a public entity *created* a dangerous roadway condition through a defective design, or whether the statutory immunity also extends to claims alleging that a public entity *failed to warn* of a design element that resulted in a dangerous roadway condition." (*Tansavatdi, supra,* 14 Cal.5th at p. 647.)

Relying on its prior precedent in *Cameron v. State of California* (1972) 7 Cal.3d 318, the Supreme Court clarified that "design immunity does not

---

[22]  As introduced *ante,* the third element necessary to establish design immunity is the reasonableness of the adoption of the plan or design. (*Cornette, supra,* 26 Cal.4th at p. 66.) Here, the court determined that Caltrans met its burden as to this element of the defense, and there is no issue on appeal related to this ruling.

categorically preclude failure to warn claims that involve a discretionarily approved element of a roadway." (*Tansavatdi, supra,* 14 Cal.5th at p. 647.) " '[W]here the state is immune from liability for injuries caused by a dangerous condition of its property because the dangerous condition was created as a result of a plan or design which conferred immunity under [Government Code] section 830.6, the state may nevertheless be liable for failure to warn of this dangerous condition.' " (*Ibid*, quoting *Cameron,* at p. 329.)

As the court explained, there are two distinct grounds for dangerous conditions liability under section 835: "liability for injuries caused by a dangerous condition that the public entity *created* (§ 835, subd. (a)); and liability for failing to protect against a dangerous condition of which the public entity had notice (*id.*, subd. (b).)" (*Tansavatdi, supra,* 14 Cal.5th at p. 659.) "[S]ection 830.6 immunizes liability for having created a dangerous traffic condition under section 830.5, subdivision (a) (a form of active negligence) but does not necessarily immunize liability for failing to warn of a *known* dangerous traffic condition under section 835, subdivision (b) (a form of passive negligence)." (*Id.* at p. 660, italics added.) Thus, "a plaintiff seeking to impose liability for failure to warn of an immunized design element must prove the public entity had notice that its design resulted in a dangerous condition." (*Ibid*.)

The Supreme Court recognized that claims for failure to warn of a dangerous traffic condition may also be subject to the more limited immunity of section 830.8, which precludes government liability for failing to provide traffic or warning signals "*except* when 'necessary to warn of a dangerous condition which would not be reasonably apparent to, and would not have been anticipated by a person using the highway with due care.' "

33

(*Tansavatdi, supra,* 14 Cal.5th at p. 660, italics added.)  In such claims, a plaintiff must establish the accident-causing condition was a concealed trap. (*Id.* at p. 661.)  The plaintiff must also prove "the absence of a warning was an 'independent, separate, concurring cause of the accident' " by showing it was a substantial factor in causing the injury, meaning there was " 'some substantial link or nexus between omission and injury.' "  (*Ibid.*)

The Supreme Court synthesized the foregoing rules into elements a plaintiff must prove to establish liability for failure to warn of a dangerous traffic condition that is subject to design immunity: "(1) the public entity had actual or constructive notice that the approved design resulted in a dangerous condition [citations]; (2) the dangerous condition qualified as a concealed trap, i.e. 'would not [have been] reasonably apparent to and would not have been anticipated by, a person exercising due care' [citation]; and (3) the absence of a warning was a substantial factor in bringing about the injury."  (*Tansavatdi, supra,* 14 Cal.5th at p. 662.)

Caltrans's supplemental briefs focus on a statement in *Tansavatdi* that neither it nor *Cameron* expressed a view on, namely, "how design immunity might affect a failure to warn claim when a public entity does produce evidence that it considered whether to provide a warning."  (*Tansavatdi, supra,* 14 Cal.5th at p. 661.)  Caltrans contends it cannot be held liable for failure to warn under *Tansavatdi* because it produced evidence that two warning signs were included in the approved onramp plan.

We need not decide this issue.  Accepting, without deciding, that the existing signage was properly approved in 1996 and, therefore, subject to design immunity, this was only one of several failure to warn theories presented by Plaintiff in this case.  Plaintiff also presented evidence that Caltrans was negligent in failing to upgrade the warning signs when work

34

was done in the area during the 14 years since the onramp design was approved. Plaintiff's expert testified, "just because you build a roadway and an engineer stamped and signed off on the plans doesn't mean that in the future that the needs are going to be consistently met. The needs of the society change[]. As bicyclist and pedestrian volumes increase, traffic volumes increase, the roads need to also change."

Additionally, and more importantly, Plaintiff presented evidence about Caltrans's failure to warn because it failed to repaint the crosswalk markings in 14 years so that they were visible to a driver and it failed to trim the surrounding bushes so they did not obscure the signs. Plaintiffs presented evidence that there was no training or plan to maintain the roadway markings and bushes to ensure adequate warnings. Caltrans presented no evidence that the failures to maintain the existing warning signs and bushes were the result of an approved plan. Therefore, Caltrans did not establish that design immunity precludes liability for failure to warn, even under the scenario *Tansavatdi* left as an open question.[23]

---

[23] Prior to oral argument, Caltrans notified us of a recently published case that addressed the question left open by *Tansavatdi*. In *Stufkosky v. California Department of Transportation* (Oct. 30, 2023, B317192) ___ Cal.App.5th ___ [2023 WL 8229941, *1], plaintiffs alleged that Caltrans failed to adequately warn motorists of frequent deer crossings in a stretch of road where the decedent was killed in a chain-reaction accident after another car struck a deer. The appellate court upheld summary judgment for Caltrans based on design immunity because Caltrans submitted evidence that its approved road design plans included the quantity and placement of deer crossing signs. Plaintiffs did not dispute this evidence, but contended the warnings were inadequate. Design immunity barred plaintiffs' claims because they all involved an approved design. (*Id*. at *5.) This case has no application here where the jury found failure to warn after hearing evidence supporting multiple failure to warn theories, including theories unrelated to the approved design.

2.      *The Verdict Establishes Liability for Failure to Warn*

In our prior opinion, we determined the verdict was inconsistent on material grounds because it found both liability under section 835 and design immunity under section 830.6, which we interpreted to include immunity for failure to warn of a dangerous condition created by an approved design. Caltrans now contends that even if *Tansavatdi* applies to this case to permit liability based on failure to warn, the verdict findings remain "inconsistent" with the elements required to establish a failure to warn of roadway features otherwise entitled to design immunity.  We disagree.

a.      *The Verdict Is Consistent*

A special verdict is one "by which the jury find[s] the facts only, leaving the judgment to the Court."  (Code Civ. Proc., § 624.)  The purpose of a special verdict is for the jury to determine the ultimate facts of each claim or defense in the case, so that "nothing shall remain to the Court but to draw from them conclusions of law."  (*Ibid*.) To the extent there is an ambiguity in the special verdict after the jury is discharged, the court must " 'interpret the verdict from its language considered in connection with the pleadings, evidence and instructions.' "  (*Woodcock v. Fontana Scaffolding & Equipment Co.* (1968) 69 Cal.2d 452, 456 (*Woodcock*); accord, *Fuller v. Dept. of Transportation* (2019) 38 Cal.App.5th 1034, 1038 (*Fuller*) [consider pleadings, evidence, instructions, and arguments].)  " ' "A verdict should be interpreted so as to uphold it and give it the effect intended by the jury . . . ." ' [Citation.] Where special verdicts appear inconsistent, if any conclusions could be drawn which would explain the apparent conflict, the jury will be deemed to have drawn them."  (*Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 424.)  This is consistent with the general appellate rule that, "we are required to draw all inferences in favor of the judgment, ruling,

36

order or verdict." (*Jonkey v. Carignan Construction Co.* (2006) 139 Cal.App.4th 20, 25 (*Jonkey*).) "A special verdict is inconsistent if there is *no* possibility of reconciling its findings with each other." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357, italics added.) " ' " "Where the findings are contradictory on material issues, and the correct determination of such issues is necessary to sustain the judgment, the inconsistency is reversible error.' " ' " (*Id.* at p. 358.)

In *Fuller*, the plaintiff tried the case on the theory that, for purposes of public entity liability under section 835, there were two dangerous conditions which were substantial factors in causing him harm. (*Fuller*, *supra*, 38 Cal.App.5th at p. 1039.) The special verdict form did not ask the jury to determine which of the two conditions was dangerous. (*Ibid.*) In answering the special verdict questions, the jury found (1) there was a dangerous condition, but (2) the dangerous condition did not create a reasonably foreseeable risk of the kind of injury that occurred. (*Id.* at p. 1038.) The trial court entered judgment in favor of the defendant, and the plaintiff appealed. (*Id.* at p. 1036.) On appeal, the plaintiff argued that the special verdict findings were fatally inconsistent because the jury did not identify which of the dangerous conditions did not create a reasonably foreseeable risk. (*Id.* at p. 1038.) The appellate court disagreed explaining, "[b]ecause the special verdict form did not ask the jury to decide the issue with specificity, the jury finding on dangerous condition is tantamount to a general verdict and all reasonable inferences are drawn to support it" (*id.* at p. 1039). Applying this standard, the appellate court affirmed the defense judgment on the basis that substantial evidence supported the jury's finding that whatever dangerous condition existed, it did not create a reasonably foreseeable risk of the injury the plaintiff suffered. (*Ibid.*)

37

Similarly, in *Jonkey, supra*, 139 Cal.App.4th 20 the plaintiff was injured by a scaffold plank that fell to the ground as a scaffold was being disassembled by a subcontracting company. Plaintiff presented the jury with two theories of negligence based on how the subcontractor's employees disassembled the scaffold. The jury found the subcontractor was negligent, but also found its negligence was not a substantial factor in causing harm to the plaintiff. (*Id*. at pp. 23–24.) The appellate court rejected an argument that a general finding of negligence required the jury to find causation as a matter of law. The court concluded, "Where, as here, there is no special finding on what negligence is found by the jury, the jury's finding is tantamount to a general verdict. As long as a single theory of negligence is lawfully rebutted on a lack of causation theory, it matters not that another theory of negligence is not so rebutted." (*Id*. at p. 26.)

Here, by its answers to special verdict question Nos. 1, 2, 4, 5, and 8, the jury found each element necessary for an application of section 835 liability to a public entity for "the dangerous condition." By its answers to special verdict question Nos. 1, 3, 5, 6, and 7, the jury also found each element necessary for an application of section 830.6 design immunity for "the dangerous condition" Importantly, however, the jury *also* found by its answer to special verdict question 8 that Caltrans failed "to provide adequate warnings of the dangerous condition" and this failure to warn contributed to causing harm to Plaintiff.

As in *Fuller* and *Jonkey*, the jury was not asked to specify the element or elements of the onramp that it found dangerous, how Caltrans failed to warn of a dangerous condition, or what elements were subject to design immunity. The jury was not instructed that it could only consider *one* dangerous condition; and the first special verdict question asked only

38

whether "the onramp" was "in *a* dangerous condition." (Italics added.) Given the evidence, the arguments of counsel, and no instruction to the contrary, the jury was entitled to find section 835 liability based on one (or several) dangerous condition(s) and section 830.6 design immunity for a different dangerous condition or conditions. Additionally, Plaintiff presented multiple theories supporting failure to warn. The verdict is, therefore, not materially inconsistent as the record supports a finding of liability based on the failure to warn of a known dangerous condition, even if other conditions are subject to design immunity.

  b.  *We Decline to Apply Forfeiture*

 Caltrans complains the verdict did not specifically address the necessary elements to establish public entity liability for failure to warn of roadway features otherwise entitled to immunity or establish "what exactly the jury based its verdict on."

 Plaintiff contends Caltrans forfeited its right to contest the validity of the verdict form in this regard because Caltrans proposed virtually identical questions for the elements of failure to warn and it did not object to the form of the special verdict or to request clarification or further deliberation before the jury was discharged. (Citing *Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1681 (*Mesecher*); *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 265 (*Keener*) [" 'An objection to a defective verdict must be made before the jury is discharged. . . . [D]efects apparent when the verdict was read, and that could have been corrected, are waived [forfeited] by counsel's failure to timely object . . . unless the verdict itself is inconsistent.' "].)

 *Mesecher* involved a situation where the court found the appellant made a strategic choice in submitting a jointly drafted special verdict form that allowed a compromise verdict rather than gambling on an all-or-nothing

39

verdict. Under those circumstances, we concluded the appellant forfeited its right to assert error based on an inconsistent verdict (*Mesecher*, *supra*, 9 Cal.App.4th at pp. 1686–1687.) A forfeiture of appellate review "is not found where the record indicates that the failure to object was not the result of a desire to reap a 'technical advantage' or engage in a 'litigious strategy.' " (*Woodcock*, *supra*, 69 Cal.2d at p. 456, fn. 2.)

Here, Plaintiff initially proposed a special verdict form that listed different dangerous conditions of the onramp such as the crosswalk, the landscaping, and the signs. After meet and confer discussions with Caltrans, Plaintiff agreed to use more general language in the first question and leave the details to argument. Plaintiff still proposed asking if "the on-ramp and surrounding area" was in a dangerous condition.

Caltrans instead proposed one question about whether the onramp was in a dangerous condition. It took the position that the onramp included "all the way back to—all the way to the on-ramp." The court ultimately gave a special verdict for asking only whether the "onramp" was in a dangerous condition.

As to failure to warn, Caltrans proposed limited questions about whether it failed "to provide adequate warnings of the dangerous condition" and, if so, whether that "failure to warn" was "a separate cause of the accident." These were similar to the questions on the final verdict form provided to the jury.

Caltrans did not object to the jury's verdict when the verdict was rendered or ask for clarification about which condition the jury found dangerous or the failure to warn before the jury was discharged. It did not object to the verdict in its motion to vacate the judgment. It argued instead that a judgment against it was not consistent with the jury's finding of design

immunity for "the dangerous condition." Relying on *Weinstein v. Dept. of Transportation, supra*, 139 Cal.App.4th 52, disapproved by *Tansavatdi, supra*, 14 Cal.5th at page 659 and *Compton v. City of Santee, supra*, 12 Cal.App.4th 591, disapproved by *Tansavatdi*, at p. 659, fn. 4., Caltrans argued there was no independent cause of action for failure to warn or maintain that preludes design immunity because the jury the established "the dangerous condition was part of the design or plan for the roadway at issue." (Underlining omitted.)

There is no direct indication, as there was in *Mesecher*, that Caltrans engaged in gamesmanship by deliberately submitting a joint verdict with inconsistent questions. Nevertheless, it is evident a single question about whether the onramp was in "a dangerous condition" (Q. No. 1) and a single question about whether "the dangerous condition" that caused Plaintiff harm was "in the plan or design for the roadway" (Q. No. 6) would more easily support Caltrans's position that design immunity provided a complete defense to whatever dangerous condition the jury found to exist, even one for which it failed to warn. Caltrans admits it relied on *Weinstein* at the time the case was tried and asks us to remand the case for retrial now that *Tansavatdi* clarified the law regarding failure to warn.

On this record and given Caltrans's reliance on a line of authorities holding failure to warn was not an exception to design immunity, we decline to decide this matter based on forfeiture alone. (*Woodcock, supra*, 69 Cal.2d at p. 456, fn. 2.) However, as we explain, the verdict supports a finding of liability and there is no basis to give Caltrans a "do over" to retry the issue of failure to warn now that the Supreme Court explained existing precedent and rejected the line of authorities Caltrans elected to follow.

41

c.    *The Verdict Establishes the Elements of Failure to Warn and is*
      *Supported by Substantial Evidence*

Plaintiff contends the jury's findings, supported by substantial evidence, establish the failure to warn of a dangerous condition of the onramp based on failure to maintain crosswalk markings and warning signs and these failures were a substantial factor in causing Plaintiff harm. (*Tansavatdi, supra,* 14 Cal.5th at p. 647; *Flournoy v. State* (1969) 275 Cal.App.2d 806, 812 (*Flournoy*); see also *Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 575 [design immunity does not apply to claim of negligent maintenance].)  We agree.

i.    *Notice*

The first *Tansavatdi* factor to establish liability for failure to warn requires a plaintiff to establish "the public entity had actual or constructive notice that the approved design resulted in a dangerous condition." (*Tansavatdi, supra,* 14 Cal.5th at p. 662.)  The jury was instructed with the standard jury instruction defining notice under section 835.2.  Plaintiff had to prove Caltrans "knew of the condition and knew or should have known that it was dangerous" *or* "the condition had existed for enough time before the incident and was so obvious that [Caltrans] reasonably should have discovered the condition and known that it was dangerous."  (CACI No. 1103.)  In considering whether Caltrans should have discovered the dangerous condition, the jury was instructed with the standard instruction based on section 835.2, subdivision (b) stating the jury could consider whether Caltrans "had a reasonable inspection system and whether a reasonable system would have revealed the dangerous condition."  (CACI No. 1104.)

42

Caltrans claims it did not have sufficient notice that the crosswalk became dangerous after it was installed because it had no evidence of a prior accident at this crosswalk in its database. The jury rejected this contention by answering "yes" to both questions in Question No. 3: "Did the negligent or wrongful conduct of [Caltrans's] employee(s) acting in the scope of his/her/their employment create the dangerous condition" *and* "Did [Caltrans] have actual or constructive notice of the dangerous condition for a long enough time to have protected against it."

There is substantial evidence to support the jury's finding that Caltrans had actual or constructive notice of a dangerous condition of the onramp even if the elements of the onramp were approved in 1996. Plaintiff's expert explained Caltrans's database of roadway accidents is based only on law enforcement accident reports and does not track near misses. Plaintiff's expert pointed to a 2010 Caltrans document that acknowledged the risk to placing a pedestrian crossing on multi-lane, free-flowing traffic onramps because "they pose significant challenges for pedestrians and bicyclists and further exacerbate the problems these users face of free-flow ramps." The Caltrans report also indicated accidents at uncontrolled crossings on free-flow roadways are potentially under-reported.

Additionally, Plaintiff presented evidence that Caltrans employees worked in the surrounding area on numerous occasions, but did not refresh the crosswalk lines in the 14 years since the crosswalk was installed. Testimony from Caltrans employees indicated Caltrans's inspection system was not reasonable because there was not a system for inspection or adequate training. Even though it conducted annual night inspections for roadway markings, Caltrans failed to identify the need to refresh the faded crosswalk markings before the accident.

43

Nor did Caltrans maintain the bushes. There was a complaint about the bushes about a year and a half before the incident. The bushes were trimmed sometime thereafter, but photographs of the area taken shortly after the accident showed the bushes were again overgrown and obscured the pedestrian sign near the crosswalk. This evidence supports the jury's finding of notice.

ii. *Concealed Trap*

The second *Tansavatdi* factor to establish liability for failure to warn requires a plaintiff to establish "the dangerous condition qualified as a concealed trap, i.e., 'would not [have been] reasonably apparent to, and would not have been anticipated by, a person exercising due care.' " (*Tansavatdi, supra,* 14 Cal.5th at p. 662.) Although the verdict form did not ask whether the dangerous condition qualified as a concealed trap, the jury was instructed with the standard jury instruction for signage immunity under section 830.8, which stated, "A public entity is not responsible for harm caused by lack of additional crosswalk warning signs, crosswalk markings, or beacons *unless a reasonably careful person would not notice or anticipate a dangerous condition of property without the additional crosswalk warning signs, crosswalk markings, or beacons.*" (Italics added.) (CACI No. 1121) The jury answered "yes" to both the Questions in No. 8, that Caltrans failed to provide adequate warnings of the dangerous condition and its failure contributed to Carpio's harm. We must presume that the jury followed the jury instruction in making this finding. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

This finding is supported by substantial evidence. Plaintiff presented evidence that the onramp was a trap from the perspective of not only a driver, but also a pedestrian who was given a false sense of security to reasonably rely on the crosswalk markings. Because the crosswalk markings

44

here were faded and behind the crest of a hill with bushes obscuring the pedestrian crossing sign, motorists such as the driver were not given necessary visual cues to look for pedestrians.  The jury considered conflicting evidence and  determined Caltrans failed to warn of a dangerous condition that a reasonably, careful person would not notice or anticipate at the onramp.  Indeed, as Plaintiff points out in their appellate briefing, if the failure to warn was related to an open and obvious condition, it would make no sense for the jury to assign no percentage of fault to either Plaintiff or the driver for the accident.

  iii. *Substantial Factor*

  The third *Tansavatdi* factor to establish liability for failure to warn requires a plaintiff to prove "the absence of a warning was a substantial factor in bringing about the injury."  (*Tansavatdi, supra,* 14 Cal.5th at p. 662.)  As *Tansavatdi* explained, failure to warn is one of two forms of negligence for which a public entity may be held liable under section 835.  Failure to warn is a passive form of negligence for which a public entity may be held liable if it is an independent, separate, or concurring cause of the accident.  (*Tansavatdi, supra*, 14 Cal.5th 657.)

  The jury here was instructed with the essential factual elements to establish liability for a dangerous condition of public property under section 835.  This included the requirement that the dangerous condition was a substantial factor in causing Plaintiff's harm.  (CACI No. 1100.)  The jury received the standard instruction for the substantial factor test for causation: "A substantial factor in causing harm is a factor that a reasonable person would consider to have *contributed* to the harm.  It must be more than a remote or trivial factor.  It does not have to be the only cause of the harm." (Italics added.)  (CACI No. 430.)

45

The jury answered "yes" to both Question No. 5, which asked if the dangerous condition was a "substantial factor in causing harm" to Plaintiff and to the second part of Question No. 8 about whether the failure to warn contributed to causing Plaintiff harm.

We must presume the jury followed the jury instructions in making these findings including CACI 1100 and 430. Additionally, because the jury was not asked to specify the dangerous condition that was a substantial factor in causing Plaintiff harm, we may infer it included the failure to warn of a dangerous condition. Evidence of the failure to maintain the crosswalk markings and bushes to ensure they were visible to motorists amply supported the jury's finding of failure to warn. It is, indeed, difficult to imagine the jury could have considered these failures anything other than a substantial factor in causing Plaintiff's injuries, particularly when it found Caltrans 100 percent liable for his injuries.

Because the verdict is consistent and establishes liability against Caltrans for failure to warn of a dangerous condition, even one created by an approved design, we need not reach Plaintiff's substantial evidence challenge to the jury's finding that a dangerous condition was in the approved plan or design.

3.    *Damages Do Not Require a New Trial*

Caltrans acknowledges that Code of Civil Procedure section 377.34, subdivision (a) limits the ability of a decedent's personal representative to recover for the decedent's pain and suffering only when death occurred before judgment at the trial court level.

The Supreme Court in *Sullivan v. Delta Air Lines* (1997) 15 Cal.4th 288 concluded this statute, and is predecessor statutes, "did not abolish the common law rule that death after judgment does not abate any aspect of

46

personal tort actions, including the right to recover damages for pain and suffering." (*Id*. at p. 305.) The court explained that judgment for this purpose does not mean a final judgment after an appeal. Rather, it contemplates the finality needed for an appealable judgment, one that "is final in the fundamental sense that it leaves no issue to be determined between the parties except the fact of compliance." (*Ibid.*) This is consistent with well-established law that a trial court judgment rendered for a plaintiff before his death " 'becomes a part of his estate and may be enforced by his representatives. Accordingly, it has been held that the death of the plaintiff after such judgment and . . . during the pendency of an appeal by the defendant . . . does not abate the action, and that in such a case the judgment stands until it is vacated on appeal and, if . . . affirmed, the original judgment is good.' " (*Id.* at p. 296 quoting *Fowden v. Pacific S.S. Co.* (1906) 149 Cal.151, 154.) In what *Sullivan* described as "well-considered dictum," the appellate court in *Williamson v. Plant Insulation Co.* (1994) 23 Cal.App.4th 1406 acknowledged that barring recovery of noneconomic damages because a plaintiff died a day or two before entry of judgment may appear arbitrary, but the Legislature drew a clear line to give effect to the statute. The court stated, "Of course, the arbitrariness of the bright line can also work to the plaintiff's advantage. The plaintiff who receives a large award for pain and suffering and dies the day after judgment is entered passes that award on to his or her estate." (*Sullivan, supra* at p. 300, quoting *Williamson v. Plant Insulation Co,* at p. 1417, fn. 3.)

Caltrans, nevertheless, argues we should remand the matter for retrial of general and special damages because Carpio's lifespan is no longer uncertain and damages should be limited to only those he incurred before his death. Caltrans contends a retrial on the issue of damages would prevent an

47

"unjust result" for a public entity where an award based on a life expectancy of years "would constitute a windfall at the public's expense."

Caltrans cites the case *Williams v. The Pep Boys Manny Moe & Jack of California* (2018) 27 Cal.App.5th 225, 239 for the proposition that Code of Civil Procedure section 377.34, subdivision (a) "by definition" prohibits a decedent's representative from recovering a decedent's future damages. However, that case involved an action where the decedent died before his representative commenced the action, not one where a plaintiff died after entry of a judgment but during the pendency of an appeal.

We are not persuaded by Caltrans's arguments. Without statutory or case authority to contradict the established rule that death during an appeal does not abate a personal injury judgment, we cannot order retrial on the issue of damages alone. Whether there is any merit to Caltrans's argument that a different rule should be established for a public entity is more appropriately left to the Legislature.

C.    *Plaintiff's Appeal from the Postjudgment Order (D078581)*

After Caltrans filed its appeal of the Judgment, Plaintiff filed a postjudgment motion to enforce the terms of Caltrans's election to pay the Judgment by periodic payments under section 984. Specifically, Plaintiff sought a ruling that if a public entity elects to receive the benefit of paying a judgment through periodic payments over a period of up to 10 years, it must pay 50 percent of the judgment immediately, even if the matter is appealed.

Caltrans opposed the motion contending its appeal stayed the trial court proceedings embracing or affecting the appealed judgment under Code of Civil Procedure section 916. Caltrans acknowledged that the perfecting of an appeal does not ordinarily stay enforcement of a judgment for the

48

payment of money without the posting of a bond or an undertaking (Code Civ. Proc., §§ 917.1–917.9).  However, because Code of Civil Procedure section 995.220 exempts public entities from posting a bond or an undertaking pending an appeal of a judgment, Caltrans argued it would be contrary to legislative intent to require immediate payment of 50 percent of the judgment while an appeal is pending.

The trial court denied Plaintiff's motion to enforce the terms of Caltrans's elected periodic payment to pay the Judgment.  (§ 984.)  The trial court ruled that the matter was stayed pursuant to Code of Civil Procedure section 916, subdivision (a).  The court noted that Code of Civil Procedure section 995.220 allows a public entity to automatically stay enforcement proceedings pending an appeal without the need for a bond.  It determined it would be inconsistent, therefore, to require immediate initial payment of a periodic payment order while an appeal was pending.  The court also concluded saying, "Even if plaintiff's motion was not stayed, this court would have the authority under section 984 . . . to amend or modify the terms of the payments 'as may be just.'  Therefore, this court could determine that substantial justice is served by suspending installment payments, including the initial payment of one-half, while the appeal is pending."

Plaintiff appealed the Postjudgment Order.  The parties take substantially the same positions on appeal as they did on this issue in the proceedings before the trial court.  We conclude the court did not err in denying the motion for immediate payment.

Section 984 sets forth the procedure for a public entity that is not insured by commercial insurance to elect to make periodic payments on judgments over a certain threshold.  The public entity may pay 50 percent of

49

the judgment over 10 years, after paying 50 percent of the judgment "immediately."  (§ 984, subd. (d).)

Section 984, subdivision (e) sets forth general provisions that apply to all periodic payment judgments for public entities such as continued payments despite the death of the judgment creditor, annual adjustments to interest on the judgment, continued liability of the public entity for the judgment and interest until satisfied, and continuing jurisdiction of the court to modify or enforce the judgment "as may be just."[24]  Nothing in that subdivision suggests the initial payment or the periodic payment schedule may not be stayed pending an appeal.

---

[24]    Section 984, subdivision (e) states: "The following provisions apply to all judgments for periodic payment under this section against a public entity:

"(1) Payments shall not terminate upon the death of the judgment–creditor.

"(2) Interest at the same rate as one–year United States Treasury bills as of January 1, each year shall accrue to the unpaid balance of the judgment, and on each January 1 thereafter throughout the duration of the installment payments the interest shall be adjusted until the judgment is fully satisfied.

"(3) Throughout the term of the installment payments until the judgment is fully satisfied, the public entity shall remain liable for all payments due on the judgment and the interest.

"(4) The court shall retain jurisdiction in order to enforce, amend, modify, or approve settlement of the installment payments as may be just. Upon a motion by the judgment–creditor, the court shall accelerate the installment payments if it finds any unreasonable delay in, or failure to make payments.

"(5) The court, upon motion, may modify the installment payments consistent with Sections 1431 to 1431.5, inclusive, of the Civil Code to account for the insolvency or uncollectability of amounts of the judgment owed by joint tortfeasors. The defendant shall bring a motion for that adjustment under Section 1010 of the Code of Civil Procedure."

Indeed, the Legislature contemplated such periodic payment judgments will be appealed. Subdivision (g) directs the Judicial Council to adopt rules "providing for a reasonable extension of the time for filing the notice of appeal from a judgment on the verdict to permit an election pursuant to this section and any hearing . . . ." (§ 984, subd. (g); Cal. Rules of Court, rule 8.108(f) [the time to appeal is extended for all parties if a public entity defendant serves and files a valid election to pay a judgment in period in payments under section 984].) If the Legislature intended the initial payment on a periodic payment judgment to commence despite an appeal, a logical place for such a provision would be in subdivision (e). There is no such provision.

Code of Civil Procedure section 995.220 states in pertinent part, "Notwithstanding any other statute, if a statute provides for a bond in an action or proceeding, including but not limited to a bond for issuance of a . . . stay of enforcement of a judgment on appeal, the following public entities are not required to give the bond and shall have the same rights, remedies, and benefits as if the bond were given: [¶] (a) The State of California . . . , a state agency, department, division, commission, board, or other entity of the state . . . ."

There is scant case authority addressing these issues. However, in *City of South San Francisco v. Cypress Lawn Cemetery Assn.* (1992) 11 Cal.App.4th 916, the court determined a public entity cannot be required to post a bond to stay an appeal involving a temporary restraining order. (*Id.* at p. 921.) The court explained Code of Civil Procedure section 995.220 "reflects the deliberate conclusion of the Legislature that the public good is best served by excusing governmental entities from the security requirements otherwise imposed on litigants. One of the benefits fostered by this policy is the reduction of public funds expended in furnishing undertakings, defending

51

against efforts to recover, and responding in damages like private parties. Another advantage promoted is that those responsible for vigorous law enforcement and public administration are not inhibited by fears of personal and institutional liability." (*City of South San Francisco v. Cypress Lawn Cemetery Assn.,* at p. 922, fn. omitted.)

We conclude the appeal by Caltrans, a public entity, automatically stayed enforcement of a money judgment just as would the posting of a bond by a non-public entity. (Code Civ. Proc., §§ 916, 917.1–917.9, 995.220.) This conclusion supports the public policy considerations of allowing a public entity the latitude to test the parameters of statutes and evolving case authority that apply to it, and which it must enforce, without endangering the public fisc.

Even if section 984 could be read to allow immediate initial payment despite an appeal, it also allows the trial court discretion to amend or modify the installment payments "as may be just." (§ 984, subd. (e)(4).) The trial court indicated it was appropriate in this case to suspend the periodic payments pending the appeal. Given the complexity of the factual and legal issues in this appeal about the theories for which a public entity may be held liable for dangerous conditions of public property with the overlay of potential governmental immunities, we cannot conclude the trial court abused its discretion.

DISPOSITION

Plaintiff's cross-appeal from the Judgment is dismissed. The Judgment and the Postjudgment Order are affirmed. The parties shall bear their own costs on appeal.

IRION, J.

WE CONCUR:


McCONNELL, P. J.


DO, J.